2007 UT 74

**Richard G. FORDHAM, Plaintiff and Petitioner,**

v.

**Ryan OLDROYD, Defendant and Respondent.**

No. 20060260.

Supreme Court of Utah.

Sept. 14, 2007.

Rehearing Denied Oct. 31, 2007.

---

**29.** *Perank,* 858 P.2d at 932.

Peter C. Collins, Salt Lake City, for plaintiff.

Aaron Alma Nelson, Salt Lake City, for defendant.

On Certiorari to the Utah Court of Appeals.

NEHRING, Justice:

¶ 1 This case calls on us to consider for the first time whether Utah recognizes a professional rescuer[1] rule that stakes its claim to legitimacy in its tie to sound public policy. We conclude that such a rule properly occupies a place in our law. By adopting a rule grounded in public policy, we intend to communicate the clear and unambiguous conviction that professional rescue activities are wholly compatible with, and in fact essential to, defining the proper role of professional rescuers in civil society. Accordingly, we hold that Ryan Oldroyd owed no duty to Utah Highway Patrol Trooper Richard Fordham, who was injured while responding to an automobile accident to which Mr. Oldroyd's negligence may have contributed.

## BACKGROUND

¶ 2 While driving east into Salt Lake City on an off-ramp of Interstate 15, Ryan Oldroyd encountered icy and snowy road conditions, lost control of his vehicle, and crashed. Several Salt Lake City police officers and Utah Highway Patrol troopers including Richard Fordham responded to the scene. When Trooper Fordham arrived, he stopped his car in one of the eastbound travel lanes and walked to the rear of his patrol vehicle to retrieve warning flares from his trunk. As he was retrieving the flares, a third driver lost control of her automobile and struck Trooper Fordham, causing him serious bodily injuries.

¶ 3 Trooper Fordham filed suit in district court seeking damages from Mr. Oldroyd because Mr. Oldroyd's negligence was allegedly the proximate cause of the injuries. Mr.

Oldroyd moved for summary judgment. He asserted that the professional rescuer doctrine barred Trooper Fordham as a matter of law from recovering damages for injuries sustained while acting in the course and scope of his employment as a highway patrol trooper. The district court agreed with Mr. Oldroyd and granted his motion for summary judgment. The court of appeals affirmed and adopted a professional rescuer doctrine. We granted certiorari to determine whether the court of appeals was correct in adopting the doctrine. We conclude that it was and affirm.

## ANALYSIS

¶ 4 The common law is an aggregation of judicial expressions of public policy. Courts preserve the legitimacy of the common law in two ways: by ensuring that shared values are visible within its tenets and by accommodating the imperatives of experience and changed circumstance within the common law without using undue disruption. No realm of the common law is as saturated with judicial public policy judgments as the law of torts. This is most in evidence when judges go about the business of assigning duties of care. See, e.g., Yazd v. Woodside Homes Corp., 2006 UT 47, ¶ 17, 143 P.3d 283 ("Legal duty, then, is the product of policy judgments applied to relationships."); Webb v. Univ. of Utah, 2005 UT 80, ¶ 9, 125 P.3d 906 (" 'A court's conclusion that duty does or does not exist is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." ' " (brackets in original) (quoting Univ. of Denver v. Whitlock, 744 P.2d 54, 57 (Colo.1987) (quoting Prosser and Keeton on the Law of Torts § 53, at 358 (5th ed.1984)))).

¶ 5 Of course, courts are not the exclusive arbiters of public policy. A court's

---

1. The firefighter's rule is not identical to the professional rescuer rule. As the label implies, the professional rescuer rule is not limited in its application to firefighters, but has a broader reach to bar negligence claims by those who take on a professional duty to rescue others irrespective of whether they do so in a public or private

capacity. See Maltman v. Sauer, 84 Wash.2d 975, 530 P.2d 254, 257 (1975) (presenting both rules and holding that "a professional rescuer, in making a deliberate attempt at saving a life, and under the correct factual setting, is within the intended scope of the 'rescue doctrine' "). We adopt the professional rescuer nomenclature.

pronouncements of public policy are vulnerable to the legislature's revision or outright rejection. Our recognition that the legislature is endowed with the primary responsibility to identify and codify public policy does not mean, however, that we are foreclosed from grounding our rulings in public policy judgments when circumstances invite us to enlist the common law in the cause of advancing a just society. *Cf. Yazd,* 2006 UT 47, ¶ 20, 143 P.3d 283 ("Typically, courts cede authority over matters of policy to the political branches of government. When policy considerations bear on a subject lodged firmly within the court's sphere, like the common law, it is entirely appropriate for the court to make the policy judgments necessary to get the law right."). We believe such circumstances are present here.

█ ¶ 6 In concluding that Mr. Oldroyd owed no duty to Trooper Fordham, we inquire into two matters: (1) whether the injury was derived from the negligence that occasioned the professional rescuer's response, and (2) whether the injury was within the scope of those risks inherent in the professional rescuer's duties. *See, e.g., Kreski v. Modern Wholesale Elec. Supply Co.,* 429 Mich. 347, 415 N.W.2d 178, 183–89 (1987) ("[T]he rule['s] ... most basic formulation is that a fire fighter or police officer may not recover damages from a private party for negligence in the creation of the reason for the safety officer's presence.... [T]he rule [we] adopt[] ... includes negligence in causing the incident requiring a safety officer's presence and those risks inherent in fulfilling the police or fire fighting duties."). Where, as here, it is beyond dispute that Trooper Fordham's presence at the accident scene satisfied both inquiries, we hold that Mr. Oldroyd owed Trooper Fordham no duty of care.

¶ 7 Courts of sister states have given favor to some formulation of a professional rescuer rule based on public policy. *See Moody v. Delta W., Inc.,* 38 P.3d 1139 (Alaska 2002); *Thomas v. Pang,* 72 Haw. 191, 811 P.2d 821 (1991); *Winn v. Frasher,* 116 Idaho 500, 777 P.2d 722 (1989); *Flowers v. Rock Creek Terrace Ltd. P'ship,* 308 Md. 432, 520 A.2d 361 (1987); *Kreski,* 415 N.W.2d at 183–89. The dominant public policy rationale common to all these cases is that firefighters and police officers have a relationship with the public that calls on them to confront certain hazards as part of their professional responsibilities. *See, e.g., Thomas,* 811 P.2d at 825 ("The very purpose of the fire fighting profession is to confront danger. Fire fighters are hired, trained, and compensated to deal with dangerous situations that are often caused by negligent conduct or acts. '[I]t offends public policy to say that a citizen invites private liability merely because he happens to create a need for those public services.'" (brackets in original) (quoting *Pottebaum v. Hinds,* 347 N.W.2d 642, 645 (Iowa 1984))). It would be naive to believe that fire and police professionals will be called on to draw on their training in meeting only those hazards brought on by prudent acts gone awry. Members of the public, who owing to their negligence find themselves in need of aid, should summon assistance without fear of exposing their assets to compensate their rescuer in the event of injury.

¶ 8 In rejecting the firefighter's rule in Oregon, that state's supreme court brushed aside the rationale that the rule was necessary because, without it, imperiled citizens may be reluctant to summon aid, by quoting Dean Prosser's characterization of this hesitation as "'preposterous rubbish.'" *Christensen v. Murphy,* 296 Or. 610, 678 P.2d 1210, 1217 (1984) (quoting Prosser, *Law of Torts* § 68, 397 (4th ed.1971)). This rhetoric is enough to cool the ardor of any proponent of a "chilled rescuee" justification for a professional rescuer rule. Dean Prosser's derisiveness does not deter us from believing that it is not too farfetched to expect that prudent motorists might, perhaps on the advice of their insurance carriers, confront their rescuers with waiver of liability documents or, if able to do so, engage in a dialogue with rescuers to gain assurance that they are competent to undertake the rescue. Like many, we would prefer to inhabit a society in which the consequences of one's inattention do not include the compensation of those on whom all of us collectively confer the duty to extricate us from our distress. We are confident that most citizens, including those who are conversant with compara-

tive negligence law, believe that they now inhabit such a society. While judges do not perform their judicial responsibilities by enshrining widely held assumptions into the common law, the widely held belief that one is not exposed to tort liability for negligence requiring rescue emanates from a broadly shared value about the workings of a well-ordered society.

¶ 9 Most of the handful of jurisdictions rejecting or significantly limiting the professional rescuer rule have done so, at least in part, because of its association with the discredited assumption of the risk doctrine. *See Banyai v. Arruda,* 799 P.2d 441, 443 (Colo.Ct.App.1990) (declining to adopt a rule after noting that "[t]he reasons stated as modern support for the rule are that safety officers are employed, trained, and paid to confront dangerous situations ... and that these officers undertake their profession with knowledge that personal safety is at risk"); *Christensen,* 678 P.2d at 1214–18 ("As a result of statutory abolition of implied assumption of risk, we hold that the 'fireman's rule' is abolished in Oregon."); *Minnich v. Med–Waste, Inc.,* 349 S.C. 567, 564 S.E.2d 98, 101 (2002) (rejecting a professional rescuer rule even though "a number of courts reason that police officers and firefighters, aware of the risks inherent in their chosen profession, have assumed those risks"). The taint of assumption of the risk ties has spilled over into attempts to defend the professional rescuer rule on public policy grounds. As the Oregon Supreme Court noted, "Frequently, the so-called policy reasons are merely re-draped arguments drawn from premises liability or implied assumption of the risk, neither of which are now available as legal foundations in this state." *Christensen,* 678 P.2d at 1217. The *Christensen* court was particularly eager to disrobe redraped arguments because the Oregon Legislature had abolished the doctrine of assumption of the risk in all of its forms. *See generally* Or. Rev.Stat. § 18.475(2) (1975) ("The doctrine of implied assumption of the risk is abolished.").

¶ 10 Unlike Oregon, Utah has taken a more selective approach to surrendering various forms of assumption of the risk to comparative negligence. A brief description of

express and implied assumption of the risk and a historical summary of the fate of each of its forms will assist in demonstrating why we have less to fear from an accusation that a professional rescuer rule is little more than assumption of the risk in disguise.

¶ 11 We first confronted the conflict between comparative negligence and assumption of the risk in *Jacobsen Construction Co. v. Structo–Lite Engineering, Inc.,* 619 P.2d 306 (Utah 1980). The term "assumption of the risk," we observed, had several historical definitions and applications. We emphasized the importance of the distinctions between different formulations of this term when we said that "[i]ts overuse in the number and variety of definitions of the term have [sic] brought disfavor to the defense, and the trend has been to eliminate its use in favor of the negligence language." *Id.* at 309 & n. 1 ("'The phrase "assumption of risk" is an excellent illustration of the extent to which uncritical use of words bedevils the law. A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas.'" (quoting *Tiller v. Atl. Coast Line R.R. Co.,* 318 U.S. 54, 68, 63 S.Ct. 444, 87 L.Ed. 610 (1943))).

¶ 12 Presented with the "considerable confusion" stemming from the term's indiscriminate use, we pared the varieties of assumption of the risk down to two: primary and secondary. *Id.* at 309–10. We defined primary assumption of the risk as an "alternative expression for the proposition that defendant was not negligent, that is, there was no duty owed or there was no breach of an existing duty." *Id.* at 310. We agreed with those jurisdictions that had concluded that when used in its primary sense, assumption of the risk served no purpose and should properly be folded into the concept of common-law duty. *Id.* at 310–11 (citing *Bolduc v. Crain,* 104 N.H. 163, 181 A.2d 641 (1962); *Petrone v. Margolis,* 20 N.J.Super. 180, 89 A.2d 476 (Ct.App.Div.1952); *McConville v. State Farm Mut. Auto. Ins. Co.,* 15 Wis.2d 374, 113 N.W.2d 14 (1962)). We described secondary assumption of the risk as "an affir-

mative defense to an established breach of duty and as such is a phase of contributory negligence." *Id.* at 310. Since secondary negligence was linked to contributory negligence, it could not coexist with comparative negligence. We therefore held in *Jacobsen* that use of assumption of the risk terminology was not appropriate to describe either its duty-based primary form or its secondary meaning grounded in contributory negligence. *Id.* at 310–11.

■ ¶ 13 For our purposes, *Jacobsen* imparts the important lesson that we do not violate principles of comparative negligence when we evaluate the presence or absence of duty under what had previously been denominated as primary assumption of the risk. Thus, our formulation of the professional rescuer rule—that a person does not owe a duty of care to a professional rescuer for injury that was sustained by the very negligence that occasioned the rescuer's presence and that was within the scope of hazards inherent in the rescuer's duties—is not infected with a rejected strain of assumption of the risk. We have never gone so far as to bar as offensive to comparative negligence all doctrines that, as a matter of law, impose no duty of care on an arguably negligent actor from whom an injured person might otherwise be entitled to recover under traditional tort principles.

¶ 14 We recently reaffirmed such a doctrine in *Hale v. Beckstead*, 2005 UT 24, 116 P.3d 263. When considering Trooper Fordham's appeal, the court of appeals insightfully analogized *Hale's* duty-based approach to applying the "open and obvious danger" defense to the assumption of the risk in the context of the professional rescuer rule. Further, the court of appeals correctly looked to *Hale* as an example of an instance where despite the constraints of comparative negligence, a form of the "open and obvious danger" rule endures as " ' a duty-defining rule that simply states that, under appropriate circumstances, a landowner's duty of care might not include warning or otherwise protecting visitors from obvious dangers.' " *Fordham v. Oldroyd*, 2006 UT App 50, ¶ 22, 131 P.3d 280 (quoting *Hale*, 2005 UT 24, ¶ 23, 116 P.3d 263). We believe that the duty-

based analytical model that has served us well since *Jacobsen* provides the soundest approach here. We therefore hold that Mr. Oldroyd owed no duty to Trooper Fordham because imposing one would offend sound public policy. Because it is not necessary to do more to reach the result in this case, we limit application of the rule to professional rescuers who, like firefighters and police officers, are public employees.

¶ 15 The injuries Trooper Fordham sustained were within the scope of those risks inherent in his duty as a highway patrolman. Mr. Oldroyd rolled his car because he was driving too fast considering the road conditions, and this alleged negligence was what occasioned Trooper Fordham's presence. Another car struck Trooper Fordham while he was retrieving flares from the back of his patrol car, a seemingly usual activity for a highway patrol trooper at an accident scene. *Cf. Steelman v. Lind*, 97 Nev. 425, 634 P.2d 666, 668 (1981) (barring recovery to a highway patrol trooper for injuries he sustained while undertaking a rescue because "affirmative action to protect anyone found in a precarious situation upon the highway ... forms a part of what troopers are hired to do and falls directly under the ordinary course of the duties of the occupation").

¶ 16 We do not find persuasive the argument that statutes mandating universal automobile liability coverage can be interpreted to communicate the legislature's intention to make the application of tort remedies universal. Moreover, although in this case Trooper Fordham was injured after responding to an automobile accident and would be permitted in the absence of a professional rescuer rule to pursue a tort claim against Mr. Oldroyd, an insurance-driven rationale would presumably leave Trooper Fordham without a remedy if the negligence that occasioned his response and subsequent injuries had arisen under circumstances not involving an automobile. We do not find the general availability of insurance sufficient to justify creating an exception to a professional rescuer rule for automobile accidents. It is the nature of the rescuer-rescued relationship and not the presence or absence of insurance that serves

as the public policy value animating the professional rescuer rule.

¶ 17 This is not to say that cost is not relevant to the public policy approach. It is. The nature of the rescuer-rescued relationship is one that contemplates allocation of costs across society generally for injuries sustained by professional rescuers. In this respect, the professional rescuer rule departs from the foundational tort law principle that, as between an innocent party and a negligent one, the loss should fall on the negligent party. Yet, as our analysis of the "open and obvious danger" defense in *Hale* illustrates, *see* 2005 UT 24, ¶¶ 7–31, 116 P.3d 263, the common law requires innocent parties to shoulder loss when the law declines to impose a duty on a party arguably responsible for a hazard. *Cf.* William L. Prosser, *Business Visitors and Invitees,* 26 Minn. L.Rev. 573, 610–11 (1942) ("Why, then, are visiting firemen and policemen set apart as a class to whom no duty is owed to inspect and prepare the premises? One obvious reason, which has been mentioned in nearly all of the cases, is that these individuals enter at unforeseeable moments, upon unusual parts of the premises, and under circumstances of emergency, where care in preparation cannot reasonably be looked for. A man who climbs in through a basement window in search of a fire or a thief cannot expect an assurance that he will not find a bulldog in the cellar. Regardless of benefit of invitation, there is no reason to suppose that the place has been made safe."). Notably, the consequences for an injured professional rescuer who is a public employee may be less unfair than those that would befall a private party like the plaintiff in *Hale* because responsible citizens can, and should, see to it that their public officials fairly compensate those firefighters, police officers, and others who are called upon to confront hazards as part of their callings.

## CONCLUSION

¶ 18 Trooper Fordham's injuries were within the scope of risks inherent to a high-way patrol trooper's duties and derived from the alleged negligence requiring his presence. Rather than place unnecessary and excessive analytical strain on traditional tort concepts, our law is better served by a limited formulation of a professional rescuer rule. Consistent with the professional rescuer rule we recognize today, we hold that Mr. Oldroyd owed Trooper Fordham no duty of care and affirm the court of appeals.

¶ 19 Chief Justice DURHAM, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.

WILKINS, Associate Chief Justice, concurring and dissenting:

¶ 20 I concur in the result reached by my colleagues, but disagree with the necessity of adopting any additional new rule of law to handle the questions presented by the case.

¶ 21 Although the professional rescuer rule has a fairly long and complex history in the courts of our sister states, this is the first time we have been presented with the question of whether Utah does or should recognize such a rule. The professional rescuer rule "bars those engaged in rescue work as part of their employment from recovering damages for injuries sustained on the job as a result of the negligence of the person rescued."[1]

¶ 22 The concept of a professional rescuer rule first arose in the 1892 case of *Gibson v. Leonard.*[2] In *Gibson*, the Illinois Supreme Court held that a firefighter who was injured while fighting a fire on private property could not recover tort damages from the property owner whose ordinary negligence had caused the fire.[3] The rule was couched in terms of premises liability.[4] The court determined that a firefighter who comes to the scene of a fire is a licensee, and as such, the property owner, even if he negligently started the fire, owed only those duties to the

---

1. 57A Am.Jur.2d *Negligence* § 782 (2004).

2. 143 Ill. 182, 32 N.E. 182 (1892).

3. *Id.* at 189–92, 32 N.E. 182.

4. *Id.*

firefighter that were owed to any other licensee.[5]

¶ 23 Over the years since, courts have struggled with the logic of the premises liability rationale, both because it singles out fire and police officers,[6] and because of the tortured application of the status of licencee.[7] Some courts have since abandoned the premises liability rationale because it "unfairly limit[s] the rule's application to the landowner/occupant context, thus denying liability for negligent acts of these individuals but not for others whose negligent acts injure police officers or firemen elsewhere." [8]

¶ 24 Many courts adopted a professional rescuer rule by applying an *assumption of risk* analysis. However, as states have abandoned the assumption of risk doctrine as part of the evolution of comparative negligence, so too have courts ceased to rely on assumption of risk as a foundation for their professional rescuer rule. For example, the Oregon courts adopted a professional rescuer rule using assumption of risk underpinnings but later abolished it after the Oregon State Legislature eliminated assumption of risk as a defense to tort liability.[9] Our court of appeals correctly noted that, "[a]s in Oregon ..., assumption of risk 'is no longer recognized in Utah as a total bar to recovery.' Thus, adoption of the professional-rescuer doctrine in Utah cannot be supported by a rationale based upon a theory of assumption of risk." [10]

¶ 25 Ultimately, a third rationale became necessary to support the adoption of a professional rescuer rule. That rationale, relied on by my colleagues and the court of appeals in this case, is public policy. In fact, the majority of modern decisions adopting a professional rescuer rule are supported, at least in part, on a statement of public policy. On the other hand, some courts have rejected the proffered public policy rationale, concluding that "[t]he more sound public policy ... is to decline to promulgate a rule singling out police officers and firefighters for discriminatory treatment." [11] I agree.

¶ 26 Not only have courts differed in their rationales for adopting a rule, those courts that have adopted a professional rescuer rule have fashioned widely different parameters for their rules. A number of courts have allowed the rule as a defense to negligence claims but not for willful and wanton conduct that results in injury.[12] Other courts have allowed recovery only for injuries resulting from an act of negligence beyond the initial negligence that required the officer's presence at the scene.[13] Still other courts have declined to adopt any special rule.

¶ 27 In rejecting a professional rescuer rule, the South Carolina Supreme Court said, "[T]he tort law of this state adequately addresses negligence claims ... arising out of injuries incurred by firefighters and police officers during the discharge of their

5. *Id.*

6. *See, e.g., Flowers v. Rock Creek Terrace Ltd. P'ship*, 308 Md. 432, 520 A.2d 361, 367 (1987) ("Nothing in traditional premises liability law [justifies] classifying some ... public employees as invitees and others as licensees.").

7. *See, e.g., Pearson v. Can. Contracting Co.*, 232 Va. 177, 349 S.E.2d 106, 110 (1986) ("Policemen and firemen ... enter premises as of right, under a privilege based on a public purpose. They clearly are not trespassers. Nor can they be classified as licensees or invitees, who enter with consent or invitation of the occupant, as consent and invitation are irrelevant to a policeman's or fireman's privileged entry.").

8. *Pottebaum v. Hinds*, 347 N.W.2d 642, 645 (Iowa 1984).

9. *Christensen v. Murphy*, 296 Or. 610, 678 P.2d 1210, 1218 (1984).

10. *Fordham v. Oldroyd*, 2006 UT App 50, ¶ 16, 131 P.3d 280 (citations omitted) (quoting *Hale v. Beckstead*, 2005 UT 24, ¶ 21, 116 P.3d 263); *see* Utah Code Ann. § 78–27–38 (2002).

11. *Minnich v. Med–Waste, Inc.*, 349 S.C. 567, 564 S.E.2d 98, 103 (2002).

12. *See, e.g., Miller v. Bock*, 223 Mich.App. 159, 567 N.W.2d 253, 256 (1997) ("[A] tortfeasor who acts wilfully and wantonly is so culpable that the fireman's rule ought not to preclude the injured officer from suing the egregiously culpable wrongdoer.").

13. *Minnich*, 564 S.E.2d at 101–03 (analyzing the various forms the professional rescuer rule has taken and determining that "those jurisdictions which have adopted the firefighter's rule offer no uniform justification therefor, nor do they agree on a consistent application of the rule").

duties."[14]  Again, I agree.  Special exceptions, new rules, and policy driven changes really are best left to the legislative branch of government, in my view.  Courts, albeit happy to fill the breach, are least skilled at broad policy applications.

¶ 28 Absent the adoption of an exception or other special rule, traditional tort law governs.  One relevant exception that courts in some states have adopted is the "rescue doctrine."  The rescue doctrine, as distinguished from a professional rescuer rule, allows an injured rescuer to recover damages from the person whose negligence created the need for rescue.  The *professional* rescuer rule, on the other hand, "evolved as an exception to the rescue doctrine," making it so a "rescuer who could otherwise recover [under the rescue doctrine] cannot do so if she is performing her duties as a professional."[15]  The professional rescuer rule "*limits* the *expansion* of tort liability created by the rescue doctrine."[16]  We have not adopted the "rescue doctrine."  Consequently, it becomes even more awkward to create an exception to the doctrine we have not adopted.

¶ 29 I am of the opinion that we should apply instead a traditional negligence analysis to the facts of this case.  Under this analysis, Oldroyd's simple act of negligence, in losing control of his car in icy conditions, by itself is not enough to sustain Fordham's claim for damages.  Fordham's claim fails because, as a matter of law, Oldroyd did not breach any duty owed to Fordham and Oldroyd's act was not the proximate cause of Fordham's injuries.

¶ 30 Proximate cause is a legal limit to liability.  A negligent act may at times be part of a chain of events eventually leading to an injury, but still be too remote to warrant holding the negligent party liable for the injury.  For proximate cause to exist, the relationship between the negligent act and the injury must be foreseeable.  We have held that "foreseeability is an element of proximate cause."[17]  Similarly, other courts have concluded that "[f]oreseeability is the cornerstone of proximate cause."[18]  In this case, Fordham asks us to conclude that as Oldroyd navigated his car through the snow, he should have foreseen the risk of injury to an assisting trooper from another driver and that Oldroyd should have acted, in part, with that risk in mind.  We have said that "foreseeability is required to meet the test of negligence."[19]  Fordham's injuries were not reasonably foreseeable by Oldroyd, in my view.  Oldroyd did not have a duty to protect Fordham from those injuries.  The legal separation between Oldroyd's driving onto the slick road and the trooper's injury is just too great to sustain a claim under our established law.  I do not see a need, policy driven or otherwise, to adopt a new and "special" rule to deal with these facts.  I would affirm the decision of the court of appeals on the basis of existing negligence law, and resist the temptation to express any further policy preference.

---

**14.**  *Id.* at 103.

**15.**  *Espinoza v. Schulenburg*, 212 Ariz. 215, 129 P.3d 937, 939 (2006).

**16.**  *Id.* at 940 (emphasis added).

**17.**  *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1346 (Utah 1993).

**18.**  *Dillard v. Pittway Corp.*, 719 So.2d 188, 192 (Ala.1998).

**19.**  *Steffensen*, 862 P.2d at 1346.